Filed 10/27/23  Kramer v. Perdue Foods CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SALLY KRAMER, as Successor Trustee, etc., et al., | C096527 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2018-00229850-CU-PA-GDS) |
| v. | |
| PERDUE FOODS, LLC, | |
| Defendant and Appellant. | |

This is a breach of contract action arising out of the sale of real property in rural Sacramento County.  In 2015, defendant Perdue Foods, LLC (Perdue) purchased a parcel of land from the Suckle Trust[1] for the purpose of operating a commercial scale poultry

---

[1] In 1999, Henry Marvin Suckle and Esther Fay Suckle, husband and wife, created the Suckle 1999 Living Trust, the Bypass Trust of the Suckle 1999 Living Trust, the Marital Trust of the Suckle 1999 Living Trust, and the Survivor's Trust of the Suckle 1999

1

farm. As part of the purchase and sale agreement (PSA), the Suckle Trust retained the adjacent parcel, which was used for grazing cattle and included a well (Suckle well) that supplied water for the cattle and a mobile home. The terms of the PSA provided that the mobile home would be located on Perdue's parcel, near the new property line. Because the family living in the mobile home would need water, the parties agreed, in section 3.6 of the PSA, to negotiate a separate water service agreement after closing. However, the express terms of section 3.6 of the PSA provided that the separate water service agreement must include five specific terms, including a term requiring Perdue to install a meter to measure its water use, and a term requiring Perdue to pay $1 for each gallon of water it used in excess of 100 gallons per day. Ultimately, the parties did not execute a separate water service agreement as contemplated by the PSA, and the Suckle Trust brought suit against Perdue in 2018 after discovering that Perdue had used a significant amount of water from the Suckle well, including thousands of gallons of water per day during the summer of 2017.

As relevant here, the trial court granted summary adjudication in favor of Perdue in January 2022, leaving the Suckle Trust's breach of contract claim as the only remaining claim. Following a bench trial in March 2022, the court found that Perdue had breached section 3.6 of the PSA. The court awarded the Suckle Trust damages ($1,850,413.68) and prejudgment interest ($832,686.17) in the aggregate amount of $2,683,099.85.

Perdue appeals, arguing that reversal is required because: (1) section 3.6 of the PSA is not enforceable, as it was merely an agreement to negotiate a separate water service contract; (2) the Suckle Trust breached the terms of the PSA, thereby "defeating" its breach of contract claim; (3) the trial court erred in rejecting Perdue's mistake of fact

---

Living Trust (collectively, the Suckle Trust). Because Marvin and Esther share the same last name, we refer to them by their first names to avoid confusion.

defense; (4) the court erroneously excluded an opinion of Perdue's expert; (5) the damages awarded by the court were grossly excessive and improper as a matter of law; and (6) the court erred in awarding the Suckle Trust prejudgment interest.

The Suckle Trust cross-appeals, arguing that the trial court erroneously granted summary adjudication in favor of Perdue on its claims for fraudulent misrepresentation, fraudulent concealment, and breach of the implied covenant of good faith and fair dealing. The Suckle Trust further argues the court erred in determining that punitive damages were not recoverable.

We agree with Perdue that the trial court improperly awarded the Suckle Trust prejudgment interest ($832,686.17). We also find a minor mathematical error in calculating the damages award. We affirm the order granting summary adjudication in favor of Perdue, and affirm with modifications the judgment entered following the bench trial.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize only the pertinent facts. Additional information related to the contentions raised on appeal will be set forth in the Discussion section, *post*.

*The Suckle Ranch and Trust*

Beginning at some point prior to events giving rise to this case, the Suckle family operated a poultry farm on a large parcel of land in Wilton, a rural area in Sacramento County. The family owned three continuous parcels of land that were collectively known as the Suckle Ranch. In addition to the structures for poultry, the Suckle Ranch also included a walnut orchard, approximately 440 acres of pasture, and multiple mobile homes that were used by employees working at the ranch. In 1999, the Suckle Trust was created by Marvin and Esther; it included the Suckle Ranch. Before this action was filed, Marvin died and Esther became the sole trustee.

3

*The PSA*

In 2011, Petaluma Acquisition, LLC (Petaluma) entered into a lease agreement with the Suckle Trust to raise poultry on the Suckle Ranch. The lease agreement included a provision granting Petaluma the option to purchase a portion of the Suckle Ranch at a specified price. After Petaluma notified the Suckle Trust of its intention to exercise the purchase option, Petaluma was acquired by Perdue. Thereafter, Petaluma assigned Perdue all of its rights, title, and interest in the purchase option.

In March 2015, the Suckle Trust and Perdue executed a PSA in the amount of $4,030,000. Under the terms of the PSA, which was primarily drafted by Perdue, a new property line was established that divided the Suckle Ranch, with Perdue taking ownership of the western portion of the property, which included the poultry farm and the walnut orchard (Perdue parcel). The Suckle Trust retained the eastern portion of the property, which was used to graze cattle and included a well that supplied water for the cattle and a mobile home (Suckle parcel).[2] The PSA provided that the mobile home, which was approximately 400 feet from the Suckle well, would be located on Perdue's parcel, near the new property line. The utility pole next to the Suckle well supplied power to the well's pump and the mobile home.

During the negotiations of the PSA, Perdue represented that it planned to install a new well to provide water to the mobile home. In connection with this representation, Perdue requested a utility easement from the Suckle Trust, authorizing the installation of an electrical line from the utility pole next to the Suckle well to the Perdue parcel, which would provide electricity for Perdue's new well. Alternatively, Perdue requested a water easement from the Suckle Trust, which would have allowed Perdue to "take whatever

[2] The Suckle parcel is sometimes referred to as the Meiss Road property and the Perdue parcel is sometimes referred to as the Dillard Road property. We will refer to the properties as the Suckle parcel and the Perdue parcel.

water [it] wanted" from the Suckle well. The Suckle Trust, however, made clear that it would not grant Perdue a utility or water easement, as it did not want to encumber the Suckle parcel "in any way, shape or form." As a result, the parties agreed to add section 3.6 to the PSA.

Under section 3.6 of the PSA, the parties agreed to work in "good faith" after closing to "promptly" execute a water service agreement regarding Perdue's use of water from the Suckle well and "appurtenant utilities." Section 3.6 of the PSA expressly provided that the water service agreement had to include five specific terms, including a term requiring Perdue to install a meter to measure its water use in gallons, and a term requiring Perdue to pay $1 for each gallon of water it used in excess of 100 gallons per day. The parties expressly agreed that section 3.6 of the PSA would "survive [c]losing."

It is undisputed that section 3.6 was added to the PSA "relatively late in the process," after it was discovered that the mobile home relied upon water from the Suckle well and electricity from the utility pole next to that well. At the time the PSA was executed, the parties understood that Perdue's use of water from the Suckle well would be a "temporary" or "very short-term" arrangement, which would allow the family living in the mobile home to continue using water from the Suckle parcel until a new well was installed on Perdue's parcel. The parties also understood that water from the Suckle well would *only* be used for "internal" household purposes (e.g., toilet, sink), and they estimated that the family living in the mobile home would need approximately 50 to 60 gallons of water per day. Because the Suckle Trust wanted to discourage Perdue from using water from the Suckle well, it initially proposed that Perdue pay $2.50 for each gallon of water used in excess of 100 gallons per day. However, the parties ultimately agreed to Perdue's counteroffer to pay $1 for each such overage.

5

*Relevant Events Following the Execution of the PSA*

The parties did not enter into a separate water service agreement after the PSA was executed in March 2015.**3**

In May 2015, the parties agreed to delay in executing a separate water service agreement because Perdue planned on installing a new well on its property to provide water to the mobile home, which would be completed and operational within a few months. Perdue told the Suckle Trust that it "no longer need[ed] water" from the Suckle well, "just an electricity easement." In June 2015, Perdue provided the Suckle Trust a map showing the approximate location of the "power line" easement. In October 2015, Perdue provided the Suckle Trust a draft of the utility easement, authorizing the installation of an electrical line from the utility pole next to the Suckle well to the Perdue parcel, which would require the installation of a new utility pole on the Suckle parcel.

Several months later, in January 2016, the Suckle Trust advised Perdue that, given Perdue's request for a utility easement, the Suckle Trust was "extremely concerned" that Perdue was using water from the Suckle well and electricity from the utility pole next to the well. The Suckle Trust told Perdue that the PSA does not "provide for a utility easement," and that if Perdue was diverting water from the Suckle well, the parties needed to draft a water service agreement immediately and calculate the amount Perdue owed for prior water usage. The Suckle Trust encouraged Perdue to "submit an offer" if it wanted to "utilize the well and electricity via a utility easement."

---

**3** Following the execution of the PSA, the attorneys representing the parties exchanged a number of phone calls, letters, and emails about various postclosing issues, among which included Perdue's use of water from the Suckle well, a utility easement for the Perdue parcel, an access easement for the Suckle parcel, and the payment of certain funds the Suckle Trust purportedly owed Perdue (e.g., proceeds from the walnut orchard operations, overpayment of rent under the lease agreement). Given the contentions raised on appeal, we summarize only the communications relevant to Perdue's use of water from the Suckle well.

The next day, Perdue responded as follows: "I think we have a disconnect on the utility easement. Perdue isn't asking for an easement for a well or a meter, just a utility pole so that Perdue can be billed separately for the electricity to the trailer." In this correspondence, Perdue did not indicate whether it was using water from the Suckle well.

During a phone call the following day, Perdue explained to the Suckle Trust that it wanted to "dig [its] own well," and that in order to do so it "needed to run power to the well," which would require an easement because "a [utility] pole needed to be placed near the property line" on the Suckle parcel. Several days later, Perdue told the Suckle Trust that it needed "approval for the electrical pole" because it could not "dig" its own well without the pole.

Approximately a year and one-half later, in June 2017, the Suckle Trust installed a flow meter on the Suckle well to measure Perdue's water usage. Around the same time, the Suckle Trust told Perdue that the parties needed to "memorialize the water purchase agreement." Later that same day, Perdue responded in part as follows: "[R]ecall that Perdue wants to dig its own well, but needs the attached agreement [i.e., utility easement] signed to run a line from the existing pole [on the Suckle parcel]. This will eliminate any water usage on a go-forward and we don't need a purchase agreement. We can discuss what amounts your client thinks its owed for water usage from 2015 to now."

During a two-week period in June 2017, the flow meter revealed that Perdue used nearly 50,000 gallons of water.

In July 2017, the Suckle Trust advised Perdue about the flow meter and its water usage. In this correspondence, the Suckle Trust demanded that Perdue "cease and desist appropriation of any and all water in excess of 100 gallons per day." The Suckle Trust also demanded payment of more than $2.6 million from Perdue, which was based on Perdue's estimated daily water usage from March 27, 2015 (i.e., the date the PSA was executed) to June 22, 2017. In response, Perdue installed a water meter outside the mobile home to measure its water usage.

In September 2017, Perdue cut and "capped" the water pipe to the mobile home and stopped using water from the Suckle well. Thereafter, Perdue installed a pipe connecting the mobile home to an existing well on Perdue's parcel.

The flow meter attached to the Suckle well showed that Perdue used 265,582 gallons of water from the time the meter was installed in June 2017 until Perdue stopped using water from the well in September 2017. During this 100-day period, Perdue used an average of 2,655.82 gallons of water per day. The flow meter installed outside the mobile home in July 2017 provided similar readings as the flow meter attached to the Suckle well.

*Percipient Witness Testimony Regarding Perdue's Water Usage*

Lucas Sanchez, an employee of a Perdue subsidiary, lived in the mobile home with his family during the relevant time period. Sanchez testified that, when it was "really hot" outside, he watered the area surrounding the mobile home with a sprinkler three or four days a week for approximately three to four hours. Sanchez did not water during the winter.

Tom Conlin, the rancher who grazed cattle on the Suckle parcel, testified that Sanchez was "always watering" with sprinklers in the summer, and that the mobile home had "a very lush landscape." Conlin noted that Sanchez watered in the late spring and early fall but not in the winter.

James Borchert, a Perdue employee responsible for overseeing the poultry operations, testified that Sanchez watered the lawn and trees surrounding the mobile home with a sprinkler from May through September. Borchert noted that he never saw Sanchez using the sprinkler in the winter months.

Robert Wright, the attorney who represented the Suckle Trust in connection with the PSA and at all relevant times thereafter, testified that he was aware that Perdue was using water from the Suckle well from May 2015 to July 2017. Wright testified that he

8

understood Perdue had requested a utility easement to operate a new well on its parcel to provide water to the mobile home.

*Expert Witness Testimony Regarding Perdue's Water Usage*

The Suckle Trust's expert, John Shaw, qualified as an expert in the "field of water and waste water utility industry," opined that Perdue had used approximately 1.9 million gallons of water from the Suckle well between March 2015 and September 2017, which was roughly the equivalent of running a garden hose eight hours per day, seven days per week. Shaw, a civil engineer, based his opinion on the readings provided by the flow meters, and the lack of information "to alter the average daily flow based upon climate or seasonal changes or times of use" (e.g., agricultural use, commercial use). In reaching his opinion, Shaw concluded the volume of water diverted from the Suckle well after the flow meters were installed was inconsistent with Sanchez's testimony. Shaw explained that a garden hose would "run" about five gallons per minute or 300 gallons per hour, and that the flow meters disclosed that Perdue was using approximately 2,100 gallons of water per day.

Perdue's expert, Robert Wagner, qualified as an expert on the subjects of water resource management, consumptive use, and water supply sustainability, and was also a civil engineer. He testified that Shaw's conclusion as to Perdue's water use was flawed, as Shaw relied only upon "arithmetic" (i.e., data from the flow meters), and failed to take into consideration a decrease in water usage during the months outside the irrigation season. Wagner testified that Shaw assumed, without any basis, that Perdue used the same amount of water in the winter months as it had used during the hottest, driest part of the year--July to September. Wagner explained that it was unreasonable for Shaw to conclude Perdue had used 2,100 gallons of water per day from the date the PSA was executed in March 2015 until the water pipe at the mobile home was capped in September 2017, since there were "large periods of time" when there was no "use" for that amount of water, including when it was raining. Wagner also suggested that the flow

9

meter attached to the Suckle well was incorrect, as there was "not enough demand" for 32,000 gallons of water during an eight-day period in July 2017. Wagner explained that it was "highly unlikely" Perdue had used that amount of water, as it would have resulted in over four inches of "water depth on the property."

*Pleadings*

In March 2018, Esther, as trustee of the Suckle Trust, filed this action against Perdue. The first amended (operative) complaint was filed in October 2018. It alleged: (1) breach of contract; (2) fraud--intentional misrepresentation; (3) fraud--concealment; (4) breach of the implied covenant of good faith and fair dealing; and (5) unjust enrichment against Perdue.

In March 2020, Esther died. Thereafter, pursuant to the terms of the Suckle Trust, Esther's daughters, Sally Anne Kramer and Helaine Joan Kotler, became the successor cotrustees. In July 2021, Kramer and Kotler were substituted as the named plaintiffs in this action.

*Voluntary Dismissal and Summary Adjudication*

In December 2021, the Suckle Trust voluntarily dismissed its unjust enrichment claim.

In January 2022, the trial court granted summary adjudication in favor of Perdue on the fraud claims and the breach of the implied covenant of good faith and fair dealing claim. Because the breach of contract claim was the only claim that remained, the court found that punitive damages were "not available," and therefore granted summary adjudication in favor of Perdue on this issue.

*Bench Trial*

A bench trial was held in March 2022. In May 2022, the trial court issued a statement of decision, finding that section 3.6 of the PSA was unambiguous and enforceable, and that Perdue had breached the provision. In so finding, the court rejected Perdue's contention that section 3.6 of the PSA was unenforceable because it was not a

"final agreement," explaining that "[w]hile the parties may have contemplated a more formal agreement, the terms of Section 3.6 are clear and enforceable." The court also rejected Perdue's contention that the Suckle Trust had failed to "engage in good faith to negotiate a post-closing agreement regarding Perdue's water usage," explaining that Perdue did not want such an agreement but rather a utility easement that was "not contemplated by the parties." Further, the court determined that Perdue had failed to prove any of its affirmative defenses (e.g., mistake of fact).

As for damages, the trial court found that Perdue had used an average of 2,655.82 gallons of water per day for 724 days. In so finding, the trial court explained:

"The evidence at trial showed that during the time period that the well was metered, Perdue used an average of 2,655.82 gallons of water per day. While Perdue argues the water meters were not accurate, the Court finds that since both parties installed water meters and both meters had essentially the same readings, the figure of an average of 2,655.8 gallons of daily water usage by Perdue is accurate. [Citation.] As Perdue did not incur daily charges for its use of 100 of the 2,655.8 gallons, it follows that Perdue incurred daily charges of $1.00 per gallon multiplied by 2,555.8 gallons ($2,555.80 per day). [¶] Mr. Sanchez testified that he maintained the same routine from the date the contract was entered until Perdue stopped utilizing the Suckle Family well. However, Mr. Sanchez testified that he did not irrigate the land around the mobile home in the winter. Other witnesses . . . also testified that Mr. Sanchez did not water the outside area during the winter. The court takes Judicial Notice that winter typically lasts 90 days. [Citation.] As the period for which the Suckles seek to collect damages from Perdue includes two (2) winters (180 days), it follows that Perdue only incurred charges of $2,555.80 per day for a total of 724 days (904 days minus 180 days). Accordingly, Perdue incurred charges under Section 3.6 of the PSA totaling $1,850,413.68 ($2,555.80 per day multiplied by 724 days)."

11

In concluding that the Suckle Trust was entitled to an award of prejudgment interest, the trial court found that there was no dispute regarding the amount Perdue owed for each gallon of water used in excess of 100 gallons per day, and that the calculation of Perdue's average daily water use and the amount of days Perdue was using water in excess of 100 gallons per day was capable of being made certain by calculation at the time of breach--September 17, 2017. The court further found the Suckle Trust's request for prejudgment interest for a period of "4.5 years" was acceptable, and that because the PSA was silent about prejudgment interest, the prejudgment interest rate was 10 percent per annum from the date of breach. The trial court calculated the total damages as follows: "Perdue incurred charges under Section 3.6 of the PSA totaling $1,850,413.68. To determine the prejudgment interest on the total, the total is multiplied by 0.10 (10% prejudgment interest rate), which equals $185,041.37 of interest accrued per annum. At that rate, over a 4.5 year period, Perdue accrued $832,686.17 in prejudgment interest. Thus, Plaintiff's damages total $1,850,413.68 plus $832,686.17, which equals $2,683,99.85."

*Appeal and Cross-Appeal*

Perdue filed a timely notice of appeal. The Suckle Trust filed a cross-appeal.

## DISCUSSION

We first address Purdue's appeal, which challenges various legal rulings made by the trial court in connection with the bench trial.[4] We then consider the Suckle Trust's cross-appeal, which challenges the order granting Perdue summary adjudication.

---

[4] As a threshold matter, the Suckle Trust argues that Perdue forfeited its appellate contentions by failing to provide a complete record on appeal. However, because the Suckle Trust has filed an appendix that includes the omitted portions of the record, we decline to affirm on the basis of an inadequate record.

12

# I

## *Bench Trial*

### A. *Standard of Review*

On appeal from a judgment based on a statement of decision following a bench trial, we review questions of law de novo and the trial court's factual findings for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

"Substantial evidence review requires that we ' " ' "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.' " ' " (*Espinoza v. Hepta Run, Inc.* (2022) 74 Cal.App.5th 44, 52.) "A single witness's testimony may constitute substantial evidence to support a finding." (*Thompson v. Asimos, supra,* 6 Cal.App.5th at p. 981.)

The judgment of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) As a consequence of this presumption of correctness, error must be affirmatively shown. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Thus, an appellant must demonstrate prejudicial or reversible error based on sufficient legal argument supported by citation to an adequate record. (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 556-557.) Matters not properly raised or that are lacking in adequate legal discussion will be deemed forfeited. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656; see *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 ["an appellant is required to not only cite to valid legal authority, but also explain how it applies in his case"].) It is not an appellate court's responsibility to develop an appellant's arguments. (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11.)

B.  *Enforceability of Section 3.6 of the PSA*

Perdue initially argues the trial court erred in determining that section 3.6 of the PSA is enforceable.  Perdue claims the plain language of the provision demonstrates that the parties did not intend to be bound by its terms absent the execution of a separate water service agreement.  According to Perdue, section 3.6 of the PSA does not constitute a final agreement as to water use but rather an agreement to negotiate a separate contract in that regard.  Perdue alternatively argues the language of section 3.6 of the PSA is ambiguous and the extrinsic evidence adduced at trial established that the parties did not intend for its terms to be immediately binding.

1.  *Additional Background*

In relevant part, section 3.6 of the PSA provides as follows:  "Seller and Purchaser acknowledge that an agreement for the use of a well and appurtenant utilities (the "Water Service Agreement") is necessary for access to water service on the Property and on the adjacent property owned by Seller.  Seller and Purchaser hereby covenant and agree to work in good faith to mutually agree upon the terms of the Water Service Agreement promptly after Closing, which terms shall provide that (a) Purchaser shall install a meter to measure Purchaser's water usage in gallons, (b) Purchaser shall be permitted to use up to one hundred (100) gallons of water per day at no cost to Purchaser, (c) Purchaser shall pay to Seller One and 00/100 Dollars ($1.00) for each gallon of water used in excess of one hundred (100) gallons of water per day, (d) Purchaser shall be solely responsible for all maintenance, service, and utility costs relating to the Water Service Agreement, and (e) Purchaser may terminate the Water Service Agreement upon thirty (30) days' advance written notice to Seller.  The provisions of this Section 3.6 shall survive Closing."

2.  *Applicable Legal Principles*

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and

14

lawful." (Civ. Code, § 1636;[5] *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)

The test for enforceability of an agreement is: (1) whether the parties, with the capacity to contract, manifest objectively an intent to be bound by the agreement; (2) whether the essential terms of the agreement are sufficiently definite to be enforced; (3) whether there is consideration; and (4) whether the subject matter of the agreement and its performance are lawful. (1 Williston on Contracts (4th ed. 2007) § 3:2, pp. 259-260.)

"[A]n 'agreement to agree' . . . is unenforceable under California law. '[T]here is no contract where the objective manifestations of intent demonstrate that the parties chose not to bind themselves until a subsequent agreement [was] made.' " (*Bustamante v. Intuit, Inc*. (2006) 141 Cal.App.4th 199, 213.) However, "[w]hen parties intend that an agreement be binding, the fact that a more formal agreement must be prepared and executed does not alter the validity of the agreement." (*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 48.)

" ' "Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties. In the absence of ambiguity this must be determined by a construction of the instrument taken as a whole." ' [Citation.] 'The objective intent as evidenced by the words of the instrument, not the parties' subjective intent, governs our interpretation.' " (*Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 307.) "Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further." (*Ticor Title Ins. Co. v. Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699, 1707.) "In interpreting a contract, we give the words their ordinary

---

[5] Further undesignated statutory references are to the Civil Code.

and popular meaning, unless the parties or usage have given the words a specialized or technical meaning." (*Camacho v. Target Corp.* (2018) 24 Cal.App.5th 291, 306.) " ' "[I]nterpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence." ' " (*Hot Rods, LLC v. Northrop Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166, 1178.)

When the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. (*West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (2023) 90 Cal.App.5th 1179, 1185-1186.) A contract is ambiguous only if it is reasonably susceptible of two or more interpretations. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 524.) " 'The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal.' " (*West Pueblo Partners, LLC*, at p. 1186.)

### 3. *Analysis*

We agree with the trial court that section 3.6 of the PSA is unambiguous and enforceable. The plain language of the provision objectively manifests the parties' intent to be bound by the five specific terms described therein. While the text of the provision contemplates the execution of a separate, postclosing agreement regarding Perdue's use of water from the Suckle well and appurtenant utilities (i.e., electricity), the parties expressly and unequivocally agreed that such an agreement *shall* include the terms set forth in section 3.6 of the PSA; that is, Perdue shall pay the Suckle Trust $1 for each gallon of water used in excess of 100 gallons per day. There is no objective expression in the language of the PSA establishing that the mandatory terms outlined in section 3.6 would not be binding until a separate water service agreement was subsequently executed.

We find no merit in Perdue's contention that section 3.6 of the PSA was merely an agreement to negotiate a separate, binding water service contract in the future. Nothing in the language of the PSA supports such a conclusion. And Perdue has not pointed to any extrinsic evidence demonstrating that section 3.6 of the PSA is ambiguous and reasonably susceptible to its interpretation. To the contrary, the extrinsic evidence showed that the parties intended for its terms to be immediately binding. It is undisputed that section 3.6 was added to the PSA shortly before it was executed, after the parties realized that the family living in the mobile home relied upon water and electricity from the Suckle parcel. The parties agreed that a water service agreement was necessary to ensure that the family would continue to have access to water while Perdue installed a new well on its parcel. Purdue, for its part, has not directed us to anything in the record showing that, at the time the PSA was executed, the parties did not intend for the terms of section 3.6 of the PSA to be immediately binding. Indeed, in our view, adopting Perdue's construction of section 3.6 of the PSA would contravene the objective intent of the parties as evidenced by the plain and clear text of section 3.6 of the PSA as well as the statements and conduct of the parties in connection with the drafting of the provision. Under Perdue's proffered interpretation, the Suckle Trust could have denied Perdue access to water service until the parties mutually agreed upon the terms of a separate water service agreement, thereby defeating the purpose of section 3.6 of the PSA.

Equally without merit is Perdue's contention that section 3.6 of the PSA is unenforceable because material terms were omitted. In support of its position, Perdue cites authority that, to be a binding contract, there can be no material terms left for future agreement. (See *Beck v. Am. Health Group Internat., Inc*. (1989) 211 Cal.App.3d 1555, 1562.)[6] As an initial matter, we note that Perdue has forfeited this argument by failing to

---

[6] Perdue's reliance on *Beck* is misplaced, as that case is clearly distinguishable. In *Beck*, the alleged contract was a letter expressly stating that it was a "draft outline" of the

17

raise it in the trial court. Perdue never argued, either in writing or during closing argument, that material or essential terms were omitted from section 3.6 of the PSA. Appellate courts generally do not consider arguments or theories raised for the first time on appeal. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 699; see *In re C.M.* (2017) 15 Cal.App.5th 376, 385 ["A party may not assert theories on appeal which were not raised in the trial court"].)

Forfeiture aside, we conclude that section 3.6 includes the essential terms of the water service agreement, and that such terms are sufficiently definite to be enforced. Where, as here, the parties have agreed in writing to the essential terms of a contract, even though they agree that a more formal writing is to be executed later, the written agreement which they have already signed is a binding contract. (See *Mann v. Mueller* (1956) 140 Cal.App.2d 481, 487 [when one party refuses to execute the more formal writing intended, the other has a right to rely upon the agreement already expressed in writing]; *Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 623-624 & fn. 3 ["The fact that an agreement contemplates subsequent documentation does not invalidate the agreement if the parties have agreed to its existing terms"].) A contract is formed if the terms of an agreement are "reasonably certain," that is, if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811; see also *Ersa Grae Corp.*, at p. 623 ["Under California law, a contract will be enforced if it is sufficiently definite . . . for the court to ascertain the parties' obligations and to determine

---

parties' "future agreement." (*Beck v. Am. Health Group Internat., Inc., supra*, 211 Cal.App.3d at p. 1562.) After specifying the terms of the proposed agreement, the letter requested that plaintiff sign it " 'if this is a general understanding of the agreement,' " so that the defendant could " 'forward it to Corporate Counsel *for the drafting of a contract*.' " (*Id*. at p. 1563.) The letter concluded by stating: " 'When we have a draft, we will discuss it, and *hopefully shall have a completed contract* and operating unit in the very near future.' " (*Ibid*.)

whether those obligations have been performed or breached"].) Here, the parties agreed that Perdue could use up to 100 gallons of water from the Suckle well per day at no cost, and that Perdue would be required to pay $1 for each gallon of water it used in excess of the 100-gallon threshold. The parties further agreed that Perdue was obligated to measure its water use by attaching a meter to the Suckle well, that Perdue was responsible for all maintenance, service, and utility costs relating to its use of water, and that Perdue could terminate the water service agreement by giving 30 days' written notice. These terms are sufficiently definite to be enforceable.

Contrary to Perdue's contention, section 3.6 of the PSA is not unenforceable because certain purportedly material terms were omitted, including the "duration" of the water service agreement. The record reflects that the temporal scope of Perdue's water use was not an essential term of the parties' agreement, such that its omission renders section 3.6 of the PSA unenforceable. As discussed, the evidence showed that, during the negotiation of section 3.6 of the PSA, the parties agreed that Perdue's use of water from the Suckle well would be necessary until Perdue installed a new well on its parcel to serve the mobile home. The parties understood that water service from the Suckle well would be a short-term or temporary arrangement, which would allow the family living in the mobile home to continue using water for internal household purposes. In its opening brief, Perdue concedes that the parties lacked sufficient information to establish a specific deadline for Perdue to stop using water from the Suckle well, as it was unclear how long it would take Perdue to install a new well on its parcel. On this record, it is apparent that any temporal limitation on Perdue's use of water was a collateral term, not a material or essential one. The fact that the parties had not reached an agreement on such a term does not render the other express terms in section 3.6 of the PSA unenforceable. We reach the same conclusion with respect to the other purportedly omitted material terms identified by Perdue--terms related to Perdue's responsibility to maintain and repair the Suckle well.

19

Finally, we reject Perdue's contention that the postclosing conduct of the parties demonstrates that the terms of section 3.6 of the PSA were not binding. " '[W]hen a contract is *ambiguous*, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. [Citation.] The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention.' " (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 921, italics added.) Here, as we have explained, section 3.6 of the PSA is not ambiguous. Moreover, even if we assume the provision is ambiguous, none of the postclosing conduct identified by Perdue--Perdue's failure to install a flow meter to the Suckle well, Perdue's request for a utility easement, and the Suckle Trust's demand that a water service agreement be drafted in response to Perdue's request for a utility easement--shows that the intent of the parties in drafting section 3.6 of the PSA was merely to create a contractual obligation to negotiate a separate water service agreement in the future.

C. *The Suckle Trust's Alleged Breach of Section 3.6*

Next, Perdue argues it was entitled to judgment on the breach of contract claim because the Suckle Trust failed to perform its obligation under section 3.6 of the PSA to "work in good faith" with Perdue to execute a separate, postclosing water service agreement. Perdue claims the trial court erred by implicitly finding that the Suckle Trust's performance was excused because Perdue did not want a postclosing water service agreement but rather a utility easement.

1. *Applicable Legal Principles*

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's

breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) " 'It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance. [Citation.]' [Citation.] Thus, '[o]ne who himself breaches a contract cannot recover for a subsequent breach by the other party.' " (*Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1602.)

2. *Analysis*

We reject Perdue's initial contention that the trial court erred in determining that a utility easement was *not* among the terms contemplated by the parties in executing the PSA. Purdue's claim is predicated on an incorrect interpretation of the phrase "appurtenant utilities" in section 3.6 of the PSA. The first sentence of section 3.6 of the PSA states that the parties "acknowledge that an agreement for *the use of a well and appurtenant utilities* (the 'Water Service Agreement') is necessary for access to water service" on Purdue's parcel. (Italics added.) An "appurtenance" is "[s]omething associated with another, more important thing; an accessory." (The American Heritage Dictionary of the English Language (5th ed., p. 88, col. 2; see also 1 Wolter Kluwer Bouvier Law Dictionary (Desk Ed., 2012), p. 173, col. 2 [an appurtenance (appurtenant) is "[a]n accessory to something more significant"; "an appendage, distinct element that is still a component of and subordinate to something else"].)

Perdue argues that the phrase "appurtenant utilities" refers to a utility easement that would allow Perdue to install an electrical line from the utility pole next to the Suckle well to the Perdue parcel for the purpose of operating a new well on Perdue's parcel. However, in proffering this interpretation, Perdue does not address the meaning of "appurtenant" and ignores the language and purpose of section 3.6 of the PSA, which makes clear that the term "appurtenant utilities" refers to the utilities associated with the "use of [the Suckle] well." Section 3.6 of the PSA involves an agreement for Perdue to use water from the Suckle well, which required electricity to power the pump inside the

21

well. Among the express terms outlined in section 3.6 of the PSA is a term providing that Perdue would be responsible for "all maintenance, service, and utility costs relating to the Water Service Agreement." In other words, the parties agreed that Purdue was required to, among other things, pay for the electricity associated with its use of water from the Suckle well. Contrary to Perdue's contention, nothing in the language of section 3.6 of the PSA objectively evinces an intent on the part of the parties that Perdue would be granted a utility easement. Had the parties intended for such a meaning, they easily could have said so in clear and certain terms. Moreover, the extrinsic evidence presented at trial contradicts Perdue's position. As we have explained, during the negotiations related to section 3.6 of the PSA, the Suckle Trust made clear that it would not grant Perdue a utility easement.

We also reject Perdue's contention that the trial court erred in determining that Perdue did *not* want a separate, postclosing water service agreement. In support of this contention, Perdue claims that the Suckle Trust, for years, refused to work in good faith with Perdue to reach an agreement on a "simple utility easement." The fundamental flaw in this argument is that a utility easement was not among the terms contemplated by the parties when they agreed to section 3.6 of the PSA. As discussed, Perdue was aware prior to the closing of the PSA that the Suckle Trust would not grant Perdue any easement encumbering the Suckle parcel. And section 3.6 of the PSA does not include any explicit language indicating that a utility easement would be a required term of a postclosing water service agreement. Further, the record reflects that, after the PSA was executed, Perdue made no effort to agree upon the terms of a separate water service agreement. Perdue claimed that it did not need water from the Suckle well but rather a utility easement so it could install and operate a new well on its parcel. When the Suckle Trust demanded that a water service agreement be negotiated in response to Perdue's request for a utility easement, Perdue did not agree to do so. Instead, Perdue insisted that the Suckle Trust grant it a utility easement.

22

In short, we see no basis to reverse the trial court's determination that Perdue was liable for breaching section 3.6 of the PSA. On this record, we cannot conclude, as Perdue argues, that the Suckle Trust's breach of contract claim was "defeated" by its failure to work in good faith with Purdue to mutually agree upon the terms of a separate, postclosing water service agreement.

D. *Mistake of Fact Defense*

Next, Perdue argues the trial court erred in rejecting its mutual mistake of fact defense. Perdue claims the parties were mistaken about a "basic assumption" of the water service agreement--namely, that 100 gallons of water was a close approximation of the amount of water the family living in the mobile home would use on daily basis. Perdue alternatively argues the court erred in rejecting its unilateral mistake of fact defense, for the same reason. Perdue adds that the enforcement of section 3.6 of the PSA would result in substantive unconscionability, as it would require payment to the Suckle Trust of more than $2.5 million for the use of water for a mere 30 months.

1. *Applicable Legal Principles*

A party may rescind a contract if his or her consent was given by mistake. (§ 1689, subd. (b)(1).) As relevant here, a "[m]istake of fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: [¶] 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract . . . ." (§ 1577.)

To warrant rescinding a contract, the mistake of fact must concern present facts (i.e., facts existing at the time the agreement was executed) or past facts. (*Paramount Petroleum Corp. v. Superior Court* (2014) 227 Cal.App.4th 226, 245.) "[T]here is no authority for rescission based on a mistake regarding *future events*." (*Ibid.*) A mistake concerning future events is an error in judgment, which does not constitute grounds for rescinding a contract. (See *Mosher v. Mayacamas Corp.* (1989) 215 Cal.App.3d 1, 6.) "In determining whether a mistake is a mistake of fact or an error in judgment, '[i]t is the

23

facts surrounding the mistake, not the label, i.e., "mistake of fact" or "mistake of judgment," which should control.' " (*Paramount Petroleum,* at p. 245.)

" 'If both parties are mistaken, and neither is at fault or both are equally to blame, the mistake may prevent formation of the contract.' " (*Balistreri v. Nev. Livestock Prod. Credit Ass'n* (1989) 214 Cal.App.3d 635, 642.) Where a mutual mistake "is material and goes to the essence of the contract, relief will be granted to the one against whom it is sought to be enforced." (*Estate of Barton* (1950) 96 Cal.App.2d 234, 239; see also *Guthrie v. Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 884.)

A factual mistake by one party to a contract, or unilateral mistake, affords a ground for rescission in some circumstances. (*Donovan v. Rrl Corp.* (2001) 26 Cal.4th 261, 278.) "Where the plaintiff has no reason to know of and does not cause the defendant's unilateral mistake of fact, the defendant must establish the following facts to obtain rescission of the contract: (1) the defendant made a mistake regarding a basic assumption upon which the defendant made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to the defendant; (3) the defendant does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable." (*Id.* at p. 282.)

### 2. *Analysis*

We conclude Perdue has failed to demonstrate error. Perdue does not point to anything in the record establishing a mutual or unilateral mistake of fact. As detailed *ante*, the evidence in the record shows that, at the time the PSA was executed, the parties understood that the water diverted from the Suckle well would *only* be used for *internal* household purposes. The parties estimated that the family living in the mobile home would use approximately 50 to 60 gallons of water per day. However, the parties ultimately agreed to allow Perdue to use up to a 100 gallons of water per day at no cost, and that Perdue would be required to pay $1 for each gallon of water it used per day above that threshold. The purpose of requiring Perdue to pay for water in excess of 100

24

gallons per day was to discourage water use. There was no evidence presented at trial showing that, at the time the PSA was executed, the parties were mistaken about the amount of water the family living in the mobile home would need per day for internal household purposes. Perdue does not direct us to any evidence in the record showing that the family's use of water for other purposes (e.g., irrigation) was considered by the parties in establishing the 100-gallon threshold. In executing the PSA, Perdue was aware that it had the responsibility to measure its water use by installing a meter, and that it would be liable for each gallon of water used in excess of 100 gallons per day, including any water used for external purposes. To the extent Perdue assumed that the family living in the mobile home would not use water for external purposes, Perdue's mistake was, as a matter of law, an error in judgment, not a mistake of fact. (See *Greif v. Sanin* (2022) 74 Cal.App.5th 412, 441-442 [seller of real property did not make a mistake of fact as to the agreed-upon purchase price where the evidence showed that any error on his part was due to an error in judgment in selling the property for what he later believed was too low a sales price].) Perdue bore the risk of any mistake in agreeing to the 100-gallon per day limit, as it was responsible for investigating, evaluating, and determining the amount of water needed by the family living in the mobile home. (See *id.* at p. 442 [seller of property "bore the risk of any mistake in setting the purchase price too low because he was responsible for investigating, evaluating, and determining the purchase price for the [p]roperty"].)[7]

E. *Exclusion of Expert Opinion*

Next, Perdue argues the trial court erred in precluding its expert (Wagner) from offering an opinion as to the total amount of water used. Perdue claims the trial court

---

[7] In light of our conclusions, we need not and do not consider Perdue's contention that the effect of the purported mistake of fact was such that enforcement of section 3.6 of the PSA would be unconscionable.

improperly excluded this opinion due to Wagner's failure to provide "complete" deposition testimony.

### 1. *Additional Background*

When Wagner was deposed in late January 2022, he did not offer an opinion as to the total amount of water used during the relevant period. Instead, Wagner testified that it was his *intent* to offer such an opinion, which would be based on, among other things, "observations" as well as "reference evapotranspiration data and the testimony of Mr. Sanchez and the Shaw report." Wagner explained that he had not yet performed the "calculation" to determine the total amount of water used.

In early March 2022, the Suckle Trust filed a motion in limine seeking to exclude Wagner from offering an opinion as to the total amount of water extracted from the Suckle well. Later that same day at the motion in limine conference, held on the morning of the first day of trial, Perdue claimed that Wagner had formulated a postdeposition opinion as to the total amount of water used, but conceded that this opinion was never disclosed to the Suckle Trust. Nevertheless, Perdue argued that Wagner's opinion should not be excluded because he testified at his deposition that he was "going to [give an] estimate" at trial regarding the total amount of water used based on certain factors (e.g., evapotranspiration data). Perdue claimed that Wagner's deposition testimony was sufficient to satisfy the expert disclosure requirements.

The trial court disagreed, ruling that Wagner could only offer the opinions he expressed at his deposition. The court explained that Wagner did not give a "complete" opinion at his deposition on the issue of total water use.

### 2. *Applicable Legal Principles*

"Except to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion. [Citations.] A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree

26

with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

"The expert witness disclosure requirements are intentionally rigorous." (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 181 (*Ajaxo*).) In an expert witness exchange, a party is required to " ' " 'disclose the substance of the facts and the opinions to which the expert will testify, either in his witness exchange list, or in his deposition, or both.' " ' " (*Dozier v. Shapiro* (2011) 199 Cal.App.4th 1509, 1518-1519.) "Only by such a disclosure will the opposing party have reasonable notice of the specific areas of investigation by the expert, the opinions he has reached and the reasons supporting the opinions, [so that] the opposing party can prepare for cross-examination and rebuttal of the expert's testimony." (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 919.)

"After a witness has denied at his or her deposition having reached opinions on a particular subject, the defendant is entitled to rely on that disclaimer 'until such time as appellant disclosed that [the expert] had conducted a further investigation and had reached additional opinions in a new area of inquiry.' [Citation.] When counsel is not notified when the opposing party's expert witness formulates postdeposition opinions to be offered at trial, the witness is 'in effect not made available for deposition as to the further opinions . . . .' [Citation.] ' "[T]he very purpose of the expert witness discovery statute is to give fair notice of what an expert will say at trial. . . ." ' " (*Dozier v. Shapiro*, *supra*, 199 Cal.App.4th at p. 1519.) "Fair notice allows the opposing party, in taking the expert's deposition, 'to fully explore the relevant subject area . . . and to select an expert who can respond with a competing opinion on that subject area.' [Citation.] An expert opinion that exceeds the scope of the deposition testimony may be excluded '*if* the opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably difficult.' " (*Ajaxo*, *supra,* 48 Cal.App.5th at p. 184.)

"The standard for exclusion . . . is that the offending party 'unreasonably failed' to comply with expert witness disclosure rules. [Citations.] Prejudice may be inferred from the constraints on the opposing party's ability to adequately prepare to meet the late-disclosed expert opinion that will be offered at trial." (*Ajaxo, supra,* 48 Cal.App.5th at pp. 184-185.)

3. *Analysis*

We see no evidentiary error. At his deposition, Wagner did not disclose the substance of his opinion as to the total amount of water used during the relevant period. Instead, Wagner merely indicated that it was his intent to offer an opinion on this issue. Although Wagner purportedly formulated such an opinion after his deposition, the substance of that opinion and its basis (i.e., the specific reasons supporting the opinion) were never disclosed to the Suckle Trust prior to trial. Instead, the Suckle Trust was informed on the first day of trial that Wagner had an opinion as to the total amount of water used. As a result, the Suckle Trust had no ability to adequately prepare to meet the late-disclosed opinion. In short, because Wagner's opinion was not disclosed in accordance with the expert witness disclosure rules, the trial court acted well within its discretion in excluding it. (See *Ajaxo, supra,* 48 Cal.App.5th at p. 184 [trial court did not err in excluding testimony where a trial brief announced a royalty model the expert had previously disclaimed].) Contrary to Perdue's contention, this is not the type of case where an expert merely seeks to provide an expanded description and interpretation of an opinion stated in his deposition testimony.

Perdue's reliance on *Easterby v. Clark* (2009) 171 Cal.App.4th 772, is misplaced. There, the appellate court concluded that it was error for the trial court to exclude an expert witness's trial testimony because the defendants "learned approximately three months before trial that [the expert witness] would go beyond his original deposition testimony . . . at trial." (*Id*. at p. 780.) In so concluding, the *Easterby* court explained: "[D]efendants in this case had the opportunity to take [the expert's] deposition in light of

28

his changed opinion and prepare for cross-examination and rebuttal of his testimony. The elements of unfair surprise and prejudice . . . are entirely absent in this case." (*Ibid*.) *Easterby* is clearly distinguishable, and we need discuss it no further.

F. *Damages*

Next, Perdue argues the trial court's award of damages in excess of $2.6 million cannot be upheld because it is grossly excessive and improper under California law.

1. *Applicable Legal Principles*

"Damages awarded to an injured party for breach of contract 'seek to approximate the agreed-upon performance.' [Citation.] The goal is to put the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the contract. [Citation.] In other words, the plaintiff is entitled to damages that are the equivalent to the benefit of the plaintiff's contractual bargain." (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist*. (2004) 34 Cal.4th 960, 967-968.) Damages, however, must be "clearly ascertainable in both their nature and origin" (§ 3301), and must be proximately caused by the breach (§ 3300).

When, as here, it is certain that the plaintiff has been injured by a breach of contract and the amount of damages cannot be calculated with absolute certainty, the court may base an award on an approximation so long as the court uses " 'some reasonable basis of computation.' " (*Sargon Enterprises, Inc. v. University of Southern California*, *supra*, 55 Cal.4th at pp. 774-775.) An estimate or approximation of damages is particularly appropriate when, as here, the difficulty of ascertaining the amount of damages is due to the wrongful conduct of the defendant. (See *id*. at p. 775.)

"Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered." (§ 3359.) " 'The amount of damages is a fact question,' " committed to the discretion of the trial court in the case of a bench trial. (*Fagerquist v. Western Sun Aviation, Inc*. (1987) 191

29

Cal.App.3d 709, 727.) "In assessing a claim that the [trial court's] award of damages is excessive, we do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor. We may interfere with an award of damages only when it is so large that it shocks the conscience and suggests passion, prejudice or corruption on the part of the [trial court]." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1074.)

2. *Analysis*

We conclude Perdue has failed to establish a basis for reversal. As an initial matter, we note that Perdue does not challenge the methodology used by the trial court to calculate the damages award. Nor does Perdue contend that the damages award is not supported by substantial evidence. Instead, Perdue claims that the damages award must be vacated because it is "over 700 times the [commercially] reasonable value of the water the Sanchez family purportedly used and exceeds what many Americans earn in a *lifetime*." Perdue, however, has failed to provide cogent legal argument with citation to relevant authority. Perdue cites two cases in support of its position but provides no explanation of how they apply to the circumstances of this case.[8] Given Perdue's insufficient showing, no further discussion of this issue is required. (*Keyes v. Bowen*, *supra*, 189 Cal.App.4th at pp. 655-656 [matters that are lacking in adequate legal discussion will be deemed forfeited].) "It is not our responsibility to develop an appellant's argument." (*Alvarez v. Jacmar Pacific Pizza Corp.*, *supra*, 100 Cal.App.4th at p. 1206, fn. 11.) In any event, we have independently reviewed the record and find there is nothing to support the conclusion that the damages award was motivated by passion, prejudice or corruption on the part of the trial court.

_____

[8] We have reviewed the two cases cited by Perdue and find them to be distinguishable and therefore of no assistance to Perdue.

G. *Prejudgment Interest*

Finally, Perdue argues the trial court erroneously awarded the Suckle Trust prejudgment interest in the amount of $832,686.17. Perdue claims prejudgment interest is not permitted where, as here, the amount of damages can be determined only through the resolution of disputed factual issues.

1. *Applicable Legal Principles*

A person who is entitled to recover damages that are "certain, or capable of being made certain by calculation" is also entitled to recover prejudgment interest on that amount from the date that the right to recover arose. (§ 3287, subd. (a).) " 'In other words, prejudgment interest is awarded only when the sum is liquidated within the meaning of the statute.' " (*Duale v. Mercedes-Benz USA, LLC* (2007) 148 Cal.App.4th 718, 728 (*Duale*).)

" 'Damages are deemed certain or capable of being made certain . . . where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' " (*Leff v. Gunter* (1983) 33 Cal.3d 508, 519; *Duale*, *supra*, 148 Cal.App.4th at p. 729.) The policy underlying the certainty requirement of section 3287, subdivision (a) is that "in situations where the defendant could have timely paid that amount and has thus deprived the plaintiff of the economic benefit of those funds, the defendant should therefore compensate with appropriate interest." (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 962.)

The test for recovery of prejudgment interest under section 3287, subdivision (a) is whether the *defendant* actually knows the amount owed or from reasonably available information could have calculated that amount. (*Duale, supra,* 148 Cal.App.4th at p. 729.) Prejudgment interest is not proper where the amount owed is not ascertainable from truthful data supplied by the claimant to his debtor and depends upon a judicial determination based upon conflicting evidence. (*Ibid.*; see *Collins v. City of Los Angeles*

31

(2012) 205 Cal.App.4th 140, 151 ["the general rule is that damages are unascertainable if the amount of damages depends on disputed facts or the available factual information is insufficient to determine the amount"].) " ' "Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate." ' " (*Duale,* at p. 729, italics omitted.) " 'The fact it is possible to determine with some certainty one figure which is but a single *element* in the mathematical calculations involved in deriving a claim does not necessarily render the claim itself either certain or calculable.' " (*Wisper Corp. v. California Commerce Bank, supra*, 49 Cal.App.4th at pp. 960-961.)

If damages are certain, prejudgment interest must be awarded as a matter of right under section 3287, subdivision (a). (*State of California v. Continental Ins. Co*. (2017) 15 Cal.App.5th 1017, 1038.) " ' "On appeal, we independently determine whether damages were ascertainable for purposes of the statute, absent a factual dispute as to what information was known or available to the defendant at the time." ' " (*Ibid*.)

2. *Analysis*

Applying the foregoing principles, we conclude the trial court improperly awarded the Suckle Trust prejudgment interest. The contested issues at trial were the enforceability of section 3.6 of the PSA, whether Perdue breached the terms of that provision, and the amount of damages, if any, Perdue owed to the Suckle Trust. While it is undisputed that Perdue was required to compensate the Suckle Trust $1 for each gallon of water it used in excess of 100 gallons per day, determination of the damages award in this case required the trial court to ascertain how much water Perdue had used per day from the date the PSA was executed in late March 2015 until Perdue ceased using water in mid-September 2017. The parties presented conflicting expert testimony on Perdue's water usage, and there was additional percipient witness testimony regarding Perdue's water usage, including Sanchez's testimony as to how much water he used for irrigation. Because a flow meter was not attached to the Suckle well until June 2017--more than two

32

years after the PSA was executed--Perdue did not know the amount of water it had used on a daily basis prior to that time.  Further, contrary to the trial court's determination, information as to Perdue's daily water usage was not reasonably available to Perdue at the time of the breach, such that the damages owed to the Suckle Trust were capable of being made *certain* by calculation.  Accordingly, because the amount of damages could not be resolved except by verdict, the trial court improperly awarded prejudgment interest.  Therefore, the judgment must be reduced by $832,686.17.

II

*Perdue's Motion for Summary Adjudication*

The Suckle Trust argues the trial court improperly granted summary adjudication in favor of Perdue on its fraud claims, its breach of the implied covenant of good faith and fair dealing claim, and its claim for punitive damages.

A.  *Standard of Review*

The purpose of the law of summary judgment/adjudication is to "provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute."  (See *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843 (*Aguilar*).)  A party may move for summary adjudication of a cause of action and a claim for damages if the party contends that the cause of action has no merit and there is no merit to a claim for damages.  (Code Civ. Proc., § 437c, subd. (f)(1).)  A motion for summary adjudication shall be granted if it completely disposes of a cause of action or a claim for damages.  (*Ibid*.)

"A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment."  (Code Civ. Proc., § 437c, subd. (f)(2).)  "A defendant . . . has met his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action . . . cannot be established."  (Code

Civ. Proc., § 437c, subd. (p)(2).)  A defendant need only provide evidence showing that the plaintiff cannot prove its case.  (See *Aguilar, supra,* 25 Cal.4th at pp. 853-855.)

Once the defendant has met its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to the cause of action.  The plaintiff cannot rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, must set forth the specific facts showing that a triable issue of material fact exists as to the cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2).)

Summary adjudication is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  "The materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment.' "  (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, 25 Cal.4th at p. 850.)  "Thus, a party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact.' "  (*Dollinger DeAnza Associates v. Chicago Title Ins. Co*. (2011) 199 Cal.App.4th 1132, 1144-1145.)

We independently review the trial court's decision to grant a defendant's motion for summary adjudication.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037; *Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.)  In doing so, we apply the traditional three-step analysis used by the trial court, that is, we (1) identify the pleaded issues, (2) determine if the defense has negated an element of a cause of action, and if and only if so, (3) determine if the plaintiff has raised a triable issue of fact.  (*Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175.)  "We need not defer to the trial court and are not bound by the reasons in its summary [adjudication]

ruling; we review the ruling of the trial court, not its rationale." (*Oakland Raiders*, at p. 630.)

B. *Additional Background*

As noted, *ante*, in January 2022, the trial court granted summary adjudication in favor of Perdue on the fraud claims and the breach of the implied covenant of good faith and fair dealing claim. The fraud claims were predicated on Perdue's May 2015 representation that it no longer needed water from the Suckle well, and Perdue's concealment of the fact that it was continuing to use water from the Suckle well thereafter. The fraud claims were also based on Perdue's representations and concealment of facts related to Perdue's plan to install a new well on its parcel or redirect existing plumbing on its parcel for the purpose of providing water to the mobile home. The breach of the implied covenant of good faith and fair dealing claim was predicated on Perdue's conduct in depriving the Suckle Trust of compensation for its water use by, among other things, attempting to dissuade the Suckle Trust from entering into a separate water service agreement, and by misrepresenting that it no longer needed water from the Suckle well "while concealing the facts that [it] was continuing to do so."

As for the fraudulent misrepresentation claim, the trial court found that the Suckle Trust failed to establish a triable issue of material fact as to whether it reasonably relied on the alleged misrepresentations, since it was undisputed that neither Esther nor her attorney (Wright) believed that Perdue had stopped using water from the Suckle well or began constructing its own well. For the same reason, the trial court found that the Suckle Trust had failed to establish a triable issue of material fact on its fraudulent concealment claim, specifically the element requiring the Suckle Trust to show that it was unaware of the concealed facts (e.g., Perdue's continued use of water from the Suckle well), and that it would have acted differently had it known of the concealed fact.

As for the breach of the implied covenant of good faith and fair dealing claim, the trial court found that the claim failed as a matter of law because the allegations in support

of the claim did not "go beyond" the allegations supporting the breach of contract claim, and both claims requested the same damages--compensation for water used in excess of 100 gallons per day.

Finally, because the breach of contract claim was the only remaining claim, the trial court granted summary adjudication in favor of Perdue on the Suckle Trust's claim for punitive damages.

### C. *Fraud Claims*

The Suckle Trust initially argues the trial court erred in granting summary adjudication on its fraud claims. The Suckle Trust claims there were triable issues of material fact.

#### 1. *Applicable Legal Principles*

" 'To establish a claim for fraudulent misrepresentation, the plaintiff must prove: "(1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff." ' " (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 605-606.)

To establish a claim for fraudulent concealment, the plaintiff must prove: (1) the defendant concealed or suppressed a material fact; (2) the defendant had a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by concealment or suppression of the material fact; (4) the plaintiff was unaware of the fact and would not have acted as it did if it had known of the concealed or suppressed fact; and (5) the plaintiff sustained damages as a result of the concealment or suppression of the material fact. (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 310-311; *Bank*

36

*of America Corp. v. Superior Court* (2011) 198 Cal.App.4th 862, 870.) Under a theory of fraudulent concealment, a plaintiff must show that reliance upon the purportedly fraudulent conduct was both actual and reasonable. (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1194.)

"Generally, the question of whether reliance is justifiable is one of fact. [Citations.] But the issue 'may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts.' [Citations.] Thus, in such instances where the absence of justifiable reliance is one of law, summary judgment or summary adjudication is an appropriate vehicle." (*Hoffman v. 162 North Wolfe LLC*, *supra*, 228 Cal.App.4th at p. 1194.)

### 2. *Analysis*

We conclude summary adjudication was properly granted on the fraud claims. As the trial court correctly found, the Suckle Trust did not present any evidence establishing a triable issue of material fact as to justifiable reliance. The uncontroverted evidence showed that the Suckle Trust was aware that Perdue continued to use water from the Suckle well after the PSA was executed. And the Suckle Trust conceded that it never believed Perdue had begun constructing its own well during the relevant time period. Thus, the Suckle Trust did not reasonably rely on Perdue's May 2015 representation that it was no longer using water from the Suckle well. Nor did the Suckle Trust reasonably rely on Perdue's purported concealment or suppression of the fact that it was continuing to use water thereafter. In short, because the Suckle Trust knew that Perdue was using water from the Suckle well at all relevant times, the fraud claims fail as a matter of law.

### D. *Breach of the Implied Covenant of Good Faith and Fair Dealing Claim*

Next, the Suckle Trust argues the trial court erred in granting summary adjudication on its breach of the implied covenant of good faith and fair dealing claim. The Suckle Trust claims there was a triable issue of material fact.

### 1. *Applicable Legal Principles*

" 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' [Citation.] . . . . Because the covenant is a contract term, however, compensation for its breach has almost always been limited to contract rather than tort remedies." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684; see also *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393 [enforcement of implied covenant to protect interest in having promises performed "is the traditional function of a contract action"].) In *Foley*, our Supreme Court "impliedly if not expressly[] limit[ed] the ability to recover tort damages in breach of contract situations to those where the respective positions of the contracting parties have the fiduciary characteristics of that relationship between the insurer and insured." (*Mitsui Manufacturers Bank v. Superior Court* (1989) 212 Cal.App.3d 726, 730.)

"[A]bsent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery." (*Careau & Co. v. Security Pacific Business Credit, Inc.*, *supra*, 222 Cal.App.3d at p. 1395.) Where the plaintiff has pled no special relationship affording tort recovery, and the plaintiff's breach of implied covenant claim proposes to "rely[] on the same alleged acts, simply seek[ing] the same damages or other relief already claimed in a companion contract cause of action, [the claim] may be disregarded as superfluous as no additional claim is actually stated." (*Ibid.*)

### 2. *Analysis*

We agree with the trial court that the breach of the implied covenant of good faith and fair dealing claim failed as a matter of law. This claim relies on the same acts as the breach of contract claim, and it seeks identical damages as the breach of contract claim. Indeed, in its opposition to the motion for summary adjudication, the Suckle Trust

conceded that it did not suffer any damages beyond the contractual damages "as a result of Perdue's alleged fraud." The Suckle Trust, for its part, cites no legal authority supporting a contrary result.

E. *Punitive Damages*

We find no merit in the Suckle Trust's contention that the trial court erred in granting summary adjudication in favor of Perdue on the claim for punitive damages. Because the breach of contract claim was the only remaining claim, punitive damages were not recoverable. Under California law, punitive damages are not available based on a breach of contract, even if the breach was willful, fraudulent, or malicious. (See § 3294, subd. (a); *Applied Equipment Corp. v. Litton Saudi Arabia Ltd*. (1994) 7 Cal.4th 503, 516; *Power Standards Lab, Inc. v. Federal Express Corp*. (2005) 127 Cal.App.4th 1039, 1047.)

## III

*Calculation of Damages Award*

It appears the trial court made a minor mathematical error in calculating the damages award. In computing damages, the court determined that Perdue had used 2,655.8 gallons of water per day, and that there were 904 days from the date the PSA was executed in March 2015 until Perdue stopped using water from the Suckle well in September 2017. After subtracting 100 gallons of water per day and excluding 180 days for two winters, the trial court concluded that Perdue owed the Suckle Trust damages in the amount of *$1,850,413.68*, calculated as 2,555.8 gallons per day times 724 days. However, multiplying 2,555.8 by 724 results in a total of *$1,850,399.20*. Accordingly, we will correct the clerical error.

## DISPOSITION

The trial court's order granting summary adjudication in favor of Perdue is affirmed. The trial court's award of prejudgment interest in the amount of $832,686.17 is vacated, and the judgment is modified to reflect a new judgment in favor of the Suckle

39

Trust in the amount of $1,850,399.20, which reflects the reduction of the award by the amount of prejudgment interest erroneously awarded and the correction of the mathematical error described by this opinion. The judgment entered following the bench trial is otherwise affirmed.

The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3), (a)(5).)


/s/
Duarte, J.

We concur:


/s/
Mauro, Acting P. J.


/s/
Boulware Eurie J.